Good morning. I'm David Bunkert. I'm here today on behalf of William Springer. The reason we're here today is because in Mr. Springer's case, the district court committed clear error by applying the two-offense level enhancement for possession of a firearm of a dangerous weapon under 2D1.1B1. This is a case where at no time any firearm was ever carried or otherwise possessed by Mr. Springer during his criminal conduct in West Virginia. Instead, the district court's decision… The district court's decision to apply this enhancement was based entirely on vicarious liability to Mr. Springer because his nephew, Jermaine Poole, happened to bring a gun with him during his last trip to West Virginia to sell oxymorphone pills. The facts of this case are pretty straightforward and I think are not in dispute. Mr. Springer had pled guilty in a separate case to distribution of oxymorphone pills. His criminal conduct consisted of six controlled buys during the time period of possession of the firearm. He was involved in selling relatively street-level user amounts of pills. The sales varied between two and five oxymorphone pills. And he sold a total of 21. The last sale occurred at a residence in Lewisburg of a man by the name of Joshua Smith, who shows up later in the case. But it's important to note that on none of these six occasions was Mr. Springer ever seen with a firearm. Was it ever alleged that he was carrying a gun during these transactions? Going to November of 2016, the Greenbrier County Task Force continues to buy drugs at the residence of Joshua Smith. And those continue through the first of December when they get a search warrant for the residence. When they get a search warrant for the residence, they go in and they find Mr. Springer's nephew, Jermaine Poole, who's there lying on a mattress in the living room. They also find a quantity of oxymorphone pills underneath the couch, as well as a loaded pistol. Mr. Poole has about $1,800 on him as well. So after that point in time, Mr. Smith, his girlfriend, and Mr. Poole are all indicted on a variety of drug charges, including Mr. Poole had a 924C charge. But Mr. Springer's case is left separate. Mr. Springer doesn't get indicted until after Mr. Smith and his girlfriend had entered guilty pleas. And the only thing that he's charged with are the six distributions that he made during the months of September and October. So his case is completely separate. But we get to sentencing. Now, as part of the plea, I will agree with that we did agree that he was going to be held responsible for the amount of pills that was sold at the Smith residence during the time from his involvement in September all the way through to December when they found the pills. So the pills that were found in the residence were considered as relevant conduct for sentencing purposes. So what does that add? How many drugs are we talking about? We're talking about a total relevant conduct weight here of 300 oxymorphone pills. And I will submit to the court that that is a very small quantity to the extent that over that time period, it roughly amounts to maybe two or three pills being distributed on a daily basis. And that figure also included the 21 pills that Mr. Springer had done. And we conceded at sentencing that while Mr. Springer participated in a joint undertaking venture with his nephew, it wasn't foreseeable to him that his nephew was going to bring a gun with him on this last trip. And I think that the factor that I think is important for the court to take awareness of in this case is that knowledge is key here. That I think that was a factor the district court did not consider. But the fact that Mr. Springer did not have knowledge that his nephew had done this. And Mr. Poole even said that he had... What did Judge Barger say about that? Well, she said this is not a question of actual knowledge. It's a question of foreseeability. And she thought it was foreseeable because the fact he was there selling on his behalf. That's what she relied upon. Well, that and the fact that he was coming to a house and meeting folks he had never seen before, known before. Couple that with the fact that there are plenty of cases that suggest that weapons and guns are tools of the trade of drug conspirators. And I get the fact that this is not charged as a conspiracy, but why isn't that enough along with the amount of drugs and the relationship between your client and his nephew? Well, I think the important thing here is that Mr. Poole, this was the third time he had been to that residence. He had been there two previous times and indicated that he didn't have a gun with him. Did he know the folks he was coming to meet this time around? It was the same folks. Okay. He had been to this house two times previously and had not brought a gun. His uncle had been to that house previously as well, too. That was what Mr. Smith had indicated, that he had been there and then his nephew started coming down and staying. But I don't think this was a situation where, and I think that's where the district court erred in making that finding. To the extent that Mr. Smith and his girlfriend were working together with Mr. Springer, I don't think there was a necessary concern. It wasn't reasonable to proceed. When the district court found a J93, found this, given the nature of the offense, the quantity, and the fact that Poole was bringing drugs to and staying with people, he didn't otherwise know while and until the drugs were sold. That's not correct? I think he did know them to the extent that Mr. Poole stated that he had been there two times previously. I read that. I was curious, too. I think maybe it means he didn't know except for this non-conspiracy, for these dealings with each other. He didn't otherwise know. Staying with people, he didn't otherwise know. In other words, other than bringing drugs to them. But maybe he doesn't mean that. We'll ask the government about that. I would agree with that assessment, Your Honor. But I think to the extent you're The district court relied on United States v. Kimberlin. What do you have to say about that? I think Kimberlin is different to the extent that Kimberlin, in that case, there was actual knowledge shown to the defendants as to whom the enhancement was applied. In Kimberlin, you had two co-conspirators who were aware of guns being in a car when they were, as well as money. So to the extent in Kimberlin, I think it's a different outcome because those defendants were actually aware of the existence of a firearm. Here, we have no evidence whatsoever to suggest that Springer actually knew that gun was in the house or that his nephew had actually brought it with him. So you regard Kimberlin as good law. You're not asking us to reconsider it. I'm not, Your Honor. And I believe Kimberlin was applied in the case where the defendants were also convicted of conspiracy charges. So it falls under that realm within the guile and application itself. The case that I think is factually different is this court's ruling in Gomez-Jimenez, a 2014 case. We talked about foreseeability. In that case, the court found it was foreseeable for a co-conspirator to be held to the gun enhancement because, one, he was present at the time when the police did the search of the residence. The second factor was that the defendant had actually paid for the electric bill for that residence. So he had some interest in maintaining it where the drugs and guns were stored. And the guns in that case involved a stolen assault rifle and two handguns. And then the third factor there, there was a large-scale criminal venture that included 700 grams of crack, approximately 1,600 grams of liquid cocaine, and $55,000. So what the court said there, the foreseeability aspect, one of the things that you look at is the scale of operations that was going on. And I would submit to the court that $55,000 and several hundred grams of crack is a much larger operation than what was going on in Lewisburg at Joshua Smith's house where he was selling two or three pills a day. Well, I think Kimberlin also involved a greater amount of drugs. I thought that might be one of the things you were distinguishing, but you don't think Kimberlin has any applicability, I guess. It's definitely the factor that's talked about in Gomez-Jimenez genre, the large-scale. And I think it's probably discussed in other cases, too, the large-scale amount. I think the Apple decision also referenced a situation where a gun was found in the defendant's apartment the same day the defendant is out making arrangements to buy 20 kilos of cocaine. So, yes, the large-scale, I think the foreseeability aspect for someone that's involved in large amounts of money or large amounts of drugs, I think the foreseeability aspect can be shown just because people are going to assume that you would have a gun to protect those kinds of assets. But do you need a large quantity? If so, how large? I think it's one of those things where you look at it and you have to do a comparison on a case-by-case basis. I think in this case where you had evidence of very low volume of drug transactions in terms of, like I said, it averaged about two or three pills a day, the control buys that they actually made from Joshua Smith in the month of November were only one pill apiece. So there was a very small volume there. And I would submit that the amount of pills that he had, that Mr. Poole had with him, was basically just enough for one prescription. If somebody gets prescribed oxymorphone, typically they're going to get about 90 pills for a month. So that's all he had. This case was very small in comparison to the other cases that I cited in our brief in terms of large-scale drug operations. This would not compare, Your Honors. Thank you. I think we understand you. And I have a second issue, too, Your Honor, to the extent that we had argued that the district court had abused its discretion by opposing a five-year term of supervised release instead of the guideline range of three years. And the district court indicated that she felt that consideration needed to be given to that higher sentence because of Mr. Springer's criminal history, his substance abuse record, and his limited education. And I would argue that I think that the criminal history would not be a reason to upward vary and give someone more time of supervised release. In our district, it's pretty typical that most defendants get to three years on a drug case. And this was a case that did not involve any type of mandatory minimums whatsoever. So your argument is substantive reasonableness? Is that what you're arguing? I'm arguing abusive discretion. Well, but there is an abusive discretion because the sentence is not substantively reasonable? That's correct, Your Honor. That's correct, Your Honor. So to the extent that when you look at the pre-sentence report, Mr. Springer came in a criminal history category five. But when you look at his convictions, none of the 12 points that he had occurred between the ages of 21 to 23. And Mr. Springer was 33 years old at the time of sentencing. So the bulk of his criminal conduct was in the past. It wasn't really at the time of this case. And I would submit there was nothing in his offense conduct, him selling 21 pills over the time period of a month. There was nothing in his actual criminal conduct itself that would warrant that type of increase of a sentence. Okay. I'm sorry. Do you still have one? I have nothing else to add on that point. If the Court has any other questions, I will be— It's a clear error issue and an abuse of discretion issue. Correct, Your Honor. Okay. Thank you very much. Thank you. We'll hear from the government. May it please the Court, I'm Kathleen Robeson, and I'm representing the United States. We ask that this Court will affirm the sentence—excuse me, I'm sorry, Your Honors—the sentence given by the Court below. The United States hold that the District Court did not clearly error when applying the sentencing enhancement to Mr. Springer because of the large number of drugs involved in this transaction. The District— Can I ask you something? Yes. What is the quantity of drugs that you believe is required before a sentencing court could infer the possession of a weapon by a co-conspirator? It's reasonably foreseeable. Yes, Your Honor. What I believe I think really matters is what the— All right. Well, tell me what the law—one pill will do it? Sure. Yes, Your Honor. I believe in white, which is a case that we cited in our brief. They had 300 grams of cocaine, which I think is a rough—less than one kilogram, and that would be around what we had. I also believe that the amount of money in this case was not cited in our brief, and I'm sorry, Your Honor. But in—where is it? Dominguez-Villegas, it was $26,000 in this suitcase, which is still more than that they found at the time of this—of this arrest. But if you look at the amount of drugs that Mr. Poole had and the amount of money, it was roughly $9,000. I also think that the District Court is in the best position to make this determination. The $9,000 comes from what? From the day of the—December 2nd, $9,000 in total. But if you look at the conspiracy over the course of it, there was around $30,000 made in just three months, and this is based off of the collation that Mr. Springer himself took credit for at the stipulation. He admitted to 300 pills, and I think it's pretty undisputed that each pill was sold for roughly $100. And so we think that $30,000 or 300 pills, I think that's not a clear error that the District Court found that was a large amount of drugs. Particularly in connection with just the dynamics of how these drugs were being sold, I think it's very clear from the record that the defendant, Mr. Springer, he took great precautions to protect these drugs all the way from Detroit or Ohio, wherever Mr. Springer is based, to West Virginia. The defendants crossed through three states. I believe— So your view is that regardless of how much money is involved or how many pills were involved, it's always likely that somebody's going to be carrying a gun? No. No, Your Honor, that's not my view. It's not your view? It's not the government's view? The government's not— Well, when does the gun show up? That's what Judge Mott said. She said you didn't want to answer. I'm sorry. I didn't mean to say I didn't want to answer. I'm trying to say I think the District Court's the best person to decide, and I think 300—I think it is foreseeable when it's $30,000. I think if you went full—I think it would clearly not be foreseeable for like $5,000, but I think $30,000 is in the realm of foreseeability. What about—so you were talking about the great precautions that they took? What great precautions are you talking about? Sure, and the District Court noted this in sentencing. Mr. Poole stayed with the other drug dealers, Mr. Smith and Mrs. Honaker, throughout the period that the drugs were sold. Did they know each other? I read it the same way that Judge Mott read it. They didn't know each other outside of drug dealing. They had been together several times before. However, they weren't personal acquaintances. They lived very far apart, and I think the facts of this case show there's not a lot of trust between—I classify them as the Detroit parties, which are Mr. Springer and Mr. Poole, and the West Virginia parties. Well, the record is undisputed that they've been there twice before. Yes, Your Honor. So he knew them to that extent for sure. Yes, Your Honor, and that's true. However, I think— And it was the same people. It was not just the same house. It was the same people. Yes, Your Honor, but I think what the district court was trying to get at was that these people are sheerly business associates. They're not friends, and also the fact that Mr. Poole stayed there throughout, and they only—they distributed the drugs per sale. It's not—they didn't front the drugs, so Mr. Springer never gave Mr. Smith a large amount of drugs up front, and then he would get the money back. It was quantity by quantity, and the pre-sentence report discusses this. Also, the fact that Mr. Poole stayed there at all, I think, goes to the fact that there's no trust because Mr. Springer would call Mr. Smith every time Mr. Poole was going to come, and he would be there for all these drug deals, and that's also discussed in the PSR. Okay. Do you have anything further? No, Your Honor. I would just—that's all, Your Honor. Thank you. You can talk. Okay.  Yes, Your Honor. To clarify the question the court asked, the amount of drugs that was involved in the case is on joint appendix 148. It was 73.5 grams of oxymorphone, and those were 40-milligram pills. I dispute the government's characterization of this being a large case. That quantity of pills can easily be— You say it's a large-scale operation. You say it's a small operation. I say it's a small operation, yes, Your Honor. That quantity of pills you could put in your pocket, the amount of money that he had could put in your wallet. You can't do that with $55,000 or 700 grams of cocaine or kilos. This was not—there was not any— That's why I asked you about Kimberlin, because you're quite right. Many of the defendants did have additional supporting evidence of foreseeability, but one of them didn't, and still the presumption was applied, and that's why it seems to me that such a precedent was long established before any of us were on the court. So it seemed to me you would have to make an argument that we have to reconsider Kimberlin, and as you know, panels don't reconsider other panels. Correct, Your Honor. So you'd have to take this on bank if you have a real issue. But you told me you didn't have a Kimberlin issue, so this is all academic between you and me, right? I think it falls under the case that I cited, the Gomez-Jimenez, which was consistent with Kimberlin as well, Your Honor. To go to Judge Diaz's question in terms of precautions that were taken, there were no extraordinary precautions. Basically, Mr. Springer was in Michigan. He sent his nephew down here with a bunch of pills. It wasn't like he had an armed escort or anything like that coming down. He just got here and was basically there to make sure that Mr. Smith and his girlfriend didn't use all the pills up. That was the only reason why Mr. Poole was there in the first place. So the district court placed some emphasis on the fact of the sort of familial relationship. How do you think that factors into this case? I don't think it factors in for purposes of foreseeability, because there's nothing in the record that Mr. Poole said he had talked with his uncle about bringing a gun down here. There's absolutely nothing suggests that he ever gave any indication to his uncle that he was concerned for his safety down here or that he needed to have a gun for protection. Mr. Poole basically said, I went out the week before. But drug transactions involve guns. We've said that a lot, right? That's correct. They show up in drug cases, guns show up. That's correct, Your Honor. Lots of times they indict him, the same indictment. I mean, they're in it together. But anyway. That's correct. But guns, I would submit that this is a case where a gun showed up where my client wasn't present. I understand. And I think that's the big difference that I think needs to be made here and distinguishes his situation from perhaps others. Thank you. Thank you. We will come down and greet the lawyers and then go to our last case.
judges: Diana Gribbon Motz, Robert B. King, Albert Diaz